1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9

10

11   ROSS PERRY BARKHURST,                    CASE NO. 20-5825 RJB

                      Plaintiff,              ORDER ON PLAINTIFF'S
12          v.                                MOTION FOR PARTIAL
                                              SUMMARY JUDGMENT
13   CYNDIE SUNDSTROM, a married
     individual and WASHINGTON STATE
14   DEPARTMENT OF FISH AND
     WILDLIFE, an agency of the State of
15   Washington,

16                    Defendants.

17

18          This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment.

19   Dkt. 13.  The Court has considered the pleadings filed in support of and in opposition to the

20   motion and the file herein.

21          This case arises from Defendant Cyndie Sundstrom's stop of Plaintiff's vehicle to

22   conduct an inspection of the Canadian geese in Plaintiff's possession.  Dkt. 1. Sundstrom is a

23   biologist with the Washington State Department of Fish and Wildlife ("WDFW").  *Id.*  The

24   Plaintiff now moves for partial summary judgment on his search and seizure claims brought

1   pursuant to the federal and state constitutions.  For the reasons provided below, the motion (Dkt.

2   13) should be denied.

3                    I.        **RELEVANT FACTS AND PROCEDURAL HISTORY**

4   **A.  FACTS**

5       On February 13, 2019, Plaintiff Ross P. Barkhurst, and his son, Rossiter W. Barkhurst, were

6   hunting geese on property Ross P. Barkhurst owns in Pacific County, Washington.  Dkt. 15, at 1.

7   This region of Washington, which is part of the "Pacific Flyway," is visited by seven species and

8   subspecies of Canadian Geese.  Dkt. 17, at 13.  From smallest to largest they are:  the Cackling,

9   the Aleutian, the Taverner, the Lesser, the Dusky, the Western, and the Vancouver.  Dkt. 17, at

10  14.  Harvesting Dusky Canadian Geese ("Dusky geese") was not legal at the time of these

11  events.  Dkt. 17, at 14.  The remaining species and subspecies could be hunted.  *Id.*  According to

12  WDFW Officer Todd Dielman, on any given day, eight out of ten geese flying in the area that

13  these events occurred are Dusky geese.  Dkt. 17, at 33.

14      Sundstrom, a biologist for over 23 years, was in the area searching for collared geese and

15  monitoring hunting areas where she knew that Dusky geese congregate at that time of year.  Dkt.

16  17, at 8-10. WDFW officials perform field checks to confirm that harvested geese are not Dusky

17  geese.  Dkt. 17, at 8.  Sundstrom stopped her WDFW marked truck in a public area, set up her

18  spotting scope, and started scanning property that she now knows is owned by the Plaintiff.  Dkt.

19  17, at 9-11.  She states that she was about a mile away.  Dkt. 14, at 9.  She noticed a person with

20  a gun in a blind with a spread of goose decoys in the field.  Dkt. 17, at 11.  Sundstrom also

21  noticed a "tall slender gentleman" who was not actively hunting but was standing some distance

22  away by a metal building.  Dkt. 17*,* at 11-12.  (Ross P. Barkhurst is 5'10" and his son, Rossiter

23  W. Barkhurst, is 5'8" tall.  Dkt. 15, at 3.) While she was watching, she saw one goose shot and

24

1   picked up by the person actively hunting.  Dkt. 17, at 15.  According to Sundstrom, the hunter

2   fired without time to identify his target appropriately.  Dkt. 18.  Sundstrom also observed the

3   "tall slender gentleman" picking up additional geese and moving them around on the ground by

4   the building.  Dkt. 17, at 15.  This indicated to her that he was "in possession of harvested

5   geese."  Dkt. 17, at 15.

6        Sundstrom saw the active hunter pick up two geese.  Dkt. 17, at 15.  She states that "after he

7   got to the second goose and went over [and] picked it up, both geese, as he picked them up,

8   breast toward [her,] [she] could see they were most likely a Dusky goose."  Dkt. 17, at 15.  She

9   notes that they "were very dark" and the "right size."  Dkt. 17, at 15.

10       Eventually, the "tall slender gentlemen" got onto an ATV with a cart and drove out to the

11   blind; the two tore it down and picked up the decoys.  Dkt. 14, at 13.  She watched the shorter

12   gentlemen pick up four geese and place them in the cart.  *Id.*  Sundstrom could see the breasts of

13   each one, and she believed three of the four "would be classified as very dark geese."  Dkt. 17, at

14   16.  According to Sundstrom, the two men returned to the building and packed up the truck,

15   which she thought was black.  Dkt. 14, at 16, and 18.

16       While acknowledging that true identification cannot be made without measuring the culmen

17   (the upper portion of the bill) and using a Munsell "soil chart" to determine the breast color,

18   Sundstrom felt through her experience that at least some of these geese in the Barkhursts'

19   possession were Dusky geese based on their size and breast color.  Dkt. 14, at 13-14.  Sundstrom

20   states that while Cackling geese can have dark breasts like the Dusky, they are much smaller,

21   like a mallard duck.  Dkt. 14, at 14.  She notes that the Taverner can be dark, but have a grayish

22   cast to them; they also do not have as robust a body and the wing shapes are different than the

23   Dusky.  Dkt. 14, at 14 and 18.  According to Sundstrom, Lesser and Western geese have very

24

ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 3

1  white to light grey breasts (although the Western goose is much bigger than the Lesser).  Dkt. 14,

2  at 15.   She states that the Vancouver can also have a dark breast, but is much larger than the

3  other birds.  Dkt. 14, at 14.  Sundstrom does concede that in the late 1990s she was aware of a

4  subpopulation of the Lesser geese she observed near Ocean Shores that had a dark breast.  Dkt.

5  14, at 16.  She noted these geese had blue collars on, so she thinks that they were part of a

6  population from Alaska because she was aware of a study on similar birds that had been given

7  blue collars.  *Id.* While the Plaintiffs point to a study from 2000 that one-third to one-half of

8  geese identified at a check stations were misidentified, Sundstrom had not heard of that study.

9  Dkt. 14, at 35.

10     Sundstrom waited for the two men to drive by in their truck; they did not.  Dkt. 17, at 17.

11  She decided to drive around to where she thought they may exit the property.  Dkt. 17, at 17.

12  Eventually, she saw the black truck pull onto Highway 105.  Dkt. 17, at 17-18.  She states that

13  when she got on the highway, she tried to get close to them to get a license plate number.  Dkt.

14  17, at 18.  She turned her headlights on, realized that they were on bright, and pulled back the

15  headlight switch.  Dkt. 17, at 18.

16     According to Ross P. Barkhurst, who was driving the truck, his son told him that the vehicle

17  behind them was flashing its lights four or five times at them and he "took this as a signal to pull

18  over."  Dkt. 15, at 2.  Sundstrom states that "next thing I know they're pulling over."  Dkt. 17, at

19  18.  She made a "fast decision" to pull over with them, and they ended up on a "very precarious

20  corner."  Dkt. 17, at 18.

21     At that point, Sundstrom states:

22         [T]here were cars coming, so I did not initially open my car door.  And, I believe
          it was the passenger who exited the vehicle first, and I thought, well, he's getting
23         out.  Okay.  So, I step out, and he's walking toward me, and I thought I better
          identify myself.  I said, "Hi, I'm Cyndie Sundstrom with the Department of Fish

24

ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 4

1
2
3
4

and Wildlife." Then he gave me a look like he could not hear me. So, I stepped closer and said, "My name is Cyndie Sundstrom," you know, in a louder voice. "Do you mind if I check your geese?" And he just said, "Don't mind," "Yes," "Sure." There was something in the affirmative. And then I said, "Do you mind if we find a safer location?" So, he got back in the car, or truck, I'm sorry, and I let them pick the spot.· So he pulled out; I followed. They found a pull-out, and I pulled back in behind them.

5  Dkt. 17, at 19-20.

6       Sundstrom indicates that they all got out of their vehicles and she noticed that the shorter

7  man was reaching over the bed of the truck on his tiptoes and she asked if he would like her to

8  jump up into the truck and get the geese for them. Dkt. 17, at 20. He agreed. *Id.* She then

9  asked them to identify which geese belonged to which man. Dkt. 17, at 21. They did so. *Id.*

10  Sundstrom examined the geese using a caliper to measure the culmen (the upper portion of the

11  bill) and a "soil chart" to determine the breast color. Dkt. 17, at 21. She indicated that both

12  measurements are needed to be able to confirm the type of specie or subspecie. Dkt. 17, at 21.

13  Based on that criteria, Sundstrom found that seven of the eight geese were Dusky Geese. Dkt.

14  17, at 22.

15       Sundstrom states that she let the Barkhursts know that she was going to have to call

16  enforcement. Dkt. 17, at 23. According to Ross P. Barkhurst, Sundstrom said, "I am going to

17  have to hold you," and so he did not feel free to leave. Dkt. 15, at 3.

18      Sundstrom called Officer Todd Dielman because so many Dusky Geese had been taken and

19  she was not permitted to handle a situation where more than one had been taken. Dkt. 17, at 23.

20  Officer Dielman indicated that he was getting off a boat with other officers and was about 20

21  minutes away. *Id.* While they waited, Sundstrom and the Barkhursts further examined the

22  geese, sexed them, and discussed how to tell an adult from a juvenile. Dkt. 17, at 24. Three

23  WDFW officers arrived, including Officer Todd Dielman and Officer Thomas Bolt. Dkt. 17, at

24

ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 5

1   24-25.  After the officers arrived, Sundstrom turned the interaction with the Barkhursts over to

2   the officers and stepped away.  *Id., at 25.*

3        After discussing the situation, Officer Bolt issued citations to both Barkhursts for violation of

4   RCW 77.15.400.2B, unlawful hunting of wild birds in the second degree.  Dkt. 18, at 4-5, and 7.

5   These charges were ultimately dismissed.  Dkt. 15, at 3.

6   **B.  PROCEDURAL HISTORY**

7        This case was originally filed in Thurston County Superior Court on July 15, 2020 and was

8   removed on August 17, 2020.  Dkt. 1.  A related case, based on the same event, brought by

9   Rossiter W. Barkhurst, the Plaintiff's son, was also filed in Thurston County and removed to this

10   Court on August 18, 2020.  *Rossiter W. Barkhurst v. Sundstrom,* Western District of Washington

11   Case number 20-5828 RJB, Dkt. 1.

12        The complaints in both cases are nearly identical and make claims for violation of

13   Barkhursts' search and seizure rights under the Fourth Amendment to the U.S. Constitution,

14   violation of their search and seizure rights under the Washington State Constitution, common

15   law invasion of privacy, negligent infliction of emotional distress, and outrage.  Dkt. 4, at 5-9;

16   and *Rossiter W. Barkhurst v. Sundstrom,* Western District of Washington Case number 20-5828

17   RJB, Dkt. 1-3.  The Barkhursts seek a declaration that their rights were violated, damages,

18   attorneys' fees, and costs. *Id.*

19   **C.  PENDING MOTION**

20        In the pending motion, Plaintiff Ross P. Barkhurst moves for partial summary judgment on

21   his claims for violation of his search and seizure rights under both the federal and state

22   constitutions.  Dkt. 13.  He argues that Sundstrom's stop of his automobile and subsequent

23   detention of him was unconstitutional.  *Id.*  The Defendants oppose the motion (Dkt. 16), the

24

ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 6

1   Plaintiff has filed a reply (Dkt. 18), and the motion is ripe for consideration.  Qualified immunity

2   is not at issue in this motion.

## II.   DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

5   Summary judgment is proper only if the pleadings, the discovery and disclosure materials

6   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

7   movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (a). The moving party is

8   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

9   showing on an essential element of a claim in the case on which the nonmoving party has the

10   burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

11   of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

12   for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

13   (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

14   metaphysical doubt.").  Conversely, a genuine dispute over a material fact exists if there is

15   sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve

16   the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986);

17   *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir.

18   1987).

19   The determination of the existence of a material fact is often a close question.  The court

20   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

21   e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect.*

22   *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

23   of the nonmoving party only when the facts specifically attested by that party contradict facts

24

1 specifically attested by the moving party.  The nonmoving party may not merely state that it will

2 discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

3 to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

4 Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not

5 be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

6 **B.  CLAIMS UNDER 42 U.S.C. § 1983 GENERALLY**

7 In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the

8 conduct complained of was committed by a person acting under color of state law, and that (2)

9 the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or

10 laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other*

11 *grounds, Daniels v. Williams*, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to

12 remedy an alleged wrong only if both of these elements are present.  *Haygood v. Younger*, 769

13 F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

14 A plaintiff must set forth the specific factual bases upon which he claims each defendant

15 is liable under 42 U.S.C. § 1983.  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  Vague

16 and conclusory allegations of official participation in a civil rights violations are not sufficient to

17 support a claim under § 1983.  *Ivey v. Board of Regents*, 673 F.2d 266 (9th Cir. 1982).  A

18 defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of supervisory

19 responsibility or position.  *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694

20 n.58 (1978); *Padway v. Palches*, 665 F.2d 965 (9th Cir. 1982).

21 **C.  FEDERAL CLAIM: VIOLATION OF THE FOURTH AMENDMENT**

22 The Fourth Amendment to the United States Constitution guarantees "[t]he right of the

23 people to be secure in their persons, houses, papers, and effects, against unreasonable searches

24

1   and seizures[.]" "[A] search or seizure is ordinarily unreasonable in the absence of individualized

2   suspicion of wrongdoing." *Tarabochia v. Adkins*, 766 F.3d 1115, 1121 (9th Cir. 2014)(*quoting*

3   *United States v. Fraire*, 575 F.3d 929, 931 (9th Cir.2009)).   "A seizure under the

4   Fourth Amendment occurs only when a reasonable person would not feel free to leave or decline

5   the officer's requests."  *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 938 n. 2 (9th Cir. 2020).

6   "Because stopping an automobile and detaining its occupants, even if only for a brief period and

7   for a limited purpose, constitutes a seizure under the Fourth Amendment, an official must have

8   individualized reasonable suspicion of unlawful conduct to carry out such a stop" unless an

9   exception applies.  *Tarabochia*, at 1121.

10          Considering the facts in the light most favorable to the non-moving party, the motion for

11  partial summary judgment on the federal claim (Dkt. 13) should be denied.  The Plaintiff has

12  failed to show that there are no issues of material fact or that he is entitled to a judgment as a

13  matter of law on his federal constitutional claim.

14          Under RCW 77.12.071, employees of the WDFW, "in carrying out their duties . . . on

15  public lands . . . may collect samples of tissue, fluids, or other bodily parts of . . . wildlife."  The

16  parties do not dispute that Sundstrom was an employee of WDFW or that part of her duties

17  included collecting samples of wildlife.  Pursuant to Washington Administrative Code Section

18  220-416-060, "[i]t is unlawful for hunters [in this area] to fail to comply with the directions of

19  authorized personnel related to the collection of goose subspecies information pursuant to RCW

20  77.12.071."  Accordingly, Sundstrom was authorized to give the Barkhursts directions to collect

21  information on the geese they possessed.  Arguably, when she flashed her headlights at the

22  Plaintiff's truck, she was giving them a direction to stop.  *See U.S. v. Munoz,* 701 F.2d 1293,

23  1295 (1983)(noting that stop was initiated by Fish and Game Official by "waving" Munoz over

24

1   during a roving patrol).

2       The issue, then, is whether Sundstrom had reasonable suspicion to conduct the stop.

3   When determining whether there was reasonable suspicion for a stop, courts "must look at the

4   totality of the circumstances of each case" to see whether the official has a "particularized and

5   objective basis for suspecting legal wrongdoing." *United States v. Raygoza-Garcia*, 902 F.3d

6   994, 1000 (9th Cir. 2018)(*internal quotations and citation omitted*). This allows officials "to

7   draw on their own experience and specialized training to make inferences from and deductions

8   about the cumulative information available to them that might well elude an untrained

9   person." *Id.*

10      Considering the totality of the circumstances, Sundstrom has pointed to "particularized

11  and objective basis for suspecting legal wrongdoing" justifying the stop.  Sundstrom has been a

12  biologist for more than 23 years with the WDFW observing geese in the area.  Based on that

13  experience, she was aware that Dusky geese congregate in the area and was aware in how they

14  differ in appearance from other geese.  Sundstrom states that she watched Plaintiff's son shoot a

15  goose that she suspected was a Dusky goose, through a spotting scope from a mile away.  She

16  then watched both men move geese that she felt were the right color and size to be Dusky geese.

17  Sundstrom watched them get into a pickup truck and leave.  While she acknowledges that she

18  lost sight of them for a few minutes, they eventually exited the property at one of the points she

19  knew they could exit the property.  Sundstrom, if believed, had reasonable suspicion that the

20  Plaintiff or someone in the vehicle had engaged in legal wrongdoing.  That the parties moved to

21  a second, safer location does not change the analysis. While the Barkhursts hotly contest whether

22  Sundstrom could properly identify a Dusky goose from that distance, that is an issue of fact.

23      The Plaintiff points to *Tarabochia v. Adkins,* 766 F.3d 1115 (9th Cir. 2014), arguing that

24

ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 10

1  it is dispositive of the issues in this case.  In *Tarabochia,* the court held that fish and game

2  officials that stopped the Tarabochias on a public highway, without any reason to believe that a

3  crime had been committed, violated the plaintiffs' Fourth Amendment rights.  *Id.*  In that case,

4  fish and game officials received a report that the Tarabochias, who were commercial fishermen,

5  had been seen loading fish into their truck that day.  *Id.* Rather than conducting an inspection at

6  the dock, the fish and game officials waited until the Tarabochias were on the highway and then

7  stopped them.  *Id.* The *Tarabochia* court found that it was "undisputed that [the fish and game

8  officials] had no reason to believe the salmon had been taken in violation of applicable fish and

9  game laws."  *Id.*  The fish and game officers there did not have any "reasonable suspicion" that

10  the Tarabochias had engaged in illegal conduct.  *Id.*  Rather, they relied on the administrative

11  search exception to the Fourth Amendment, which the court found inapplicable.  *Id.*

12          Contrary to the situation in *Tarabochia*, Sundstrom presents evidence that she watched

13  the Plaintiff's son shoot at least one bird she felt was a Dusky goose, and watched both men

14  handle what she reasonably believed were Dusky geese.  If believed, this was not a suspicionless

15  stop like in *Tarabochia*.  Sundstrom has pointed to "individualized reasonable suspicion of

16  unlawful conduct to carry out [the] stop."  *Tarabochia*, at 1121.

17          Moreover, her further detention of the Barkhursts was arguably justified.  There is

18  evidence that, once the parties were stopped, she asked to see the geese in the Barkhursts'

19  possession.  The Barkhursts consented.  She then asked them to separate the geese based on who

20  had shot the birds.  After that occurred, she conducted further field analysis and confirmed that

21  seven of the eight birds were Dusky geese.  At that point, she had at least reasonable suspicion of

22  unlawful conduct in order to justify detaining them until the enforcement officers arrived.  While

23  the Plaintiffs argue that the WDFW enforcement officers who arrived at the scene questioned the

24

ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 11

1    constitutionality of the stop based on *Tarabochia*, whether the officers understood the nuances of

2    the case is immaterial.  Sundstrom has pointed to sufficient issues of fact on the Plaintiff's

3    federal fourth amendment claim to defeat Plaintiff's motion for summary judgment.

4        **D.   VIOLATION OF THE WASHINGTON STATE CONSTITUTION**

5           Article 1, Section 7 of the Washington Constitution provides that "[n]o person shall be

6    disturbed in his private affairs, or his home invaded, without authority of law."  "It is well

7    established that in some areas, article I, section 7 provides greater protection than its federal

8    counterpart—the Fourth Amendment."  *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297,

9    306 (2008).  While the Plaintiff argues that the Washington constitution provides greater

10   protection than the federal constitution, he fails to argue for a different analysis.  Instead, the

11   Plaintiff relies on federal case law in his motion, maintaining that if the federal constitution was

12   violated the state constitution was as well.

13          The Plaintiff's motion for summary judgment (Dkt. 13) on his claim for violation of the

14   Washington constitution should be denied.  In Washington, an investigative stop, including a

15   traffic stop, that is based on reasonable suspicion of criminal activity, is a recognized exception

16   to Article 1, Section 7 of the Washington Constitution.  *State v. McLean,* 178 Wash. App. 236,

17   244 (2013).  For purposes of the Washington Constitution, "[a] reasonable suspicion exists when

18   specific, articulable facts and rational inferences from those facts establish a substantial

19   possibility that criminal activity . . . has occurred or is about to occur."  *Id.*  At a minimum, there

20   are issues of fact as to whether Sundstrom had "reasonable suspicion" that criminal activity had

21   occurred in the circumstances here for purposes of the Washington constitutional claim.

22

23

24

1

### III.   ORDER

2      Therefore, it is hereby **ORDERED** that:

3      Plaintiff's Motion for Summary Judgment (Dkt. 13) **IS DENIED**.

4      The Clerk is directed to send uncertified copies of this Order to all counsel of record and

5  to any party appearing *pro se* at said party's last known address.

6      Dated this 18th day of November, 2021.

7

8                                          ROBERT J. BRYAN
                                            United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24